UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 21-10011 |
| Plaintiff, | |
| vs. | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS |
| CHARLES CHAMBERS, | |
| Defendant. | |

The United States resists Defendant's Motion to Suppress, DOC 26, and submits the following memorandum in support of its resistance.

Defendant Charles Chambers seeks to suppress: 1) evidence collected from his person and residence, and 2) statements he made to law enforcement the same day his residence was searched.

As for the evidence obtained from his person and residence, Chambers claims the search was illegal. Chambers, however, was on parole for a 2015 state court conviction for child pornography and was subject to warrantless search and seizure. Additionally, Chambers consented to the search of his cell phones. The issue for the Court is whether the seizure of property pursuant to the warrantless search provision of Chambers' parole agreement was lawful.

As for the interview, the Defendant claims he was in custody while interviewed without a *Miranda* warning. Although initially handcuffed for officer safety, Chambers was uncuffed in the vehicle and advised that he could

1

end the interview at any time. The issue for the Court is whether Chambers was in custody when he made statements to law enforcement.

### A. Factual Background.

#### 1. Chambers under Parole Supervision.

On January 6, 2016, a "Further Amended Judgment of Conviction" was entered against Charles Chambers. He was sentenced to serve 8 years' incarceration in the South Dakota State Penitentiary for his conviction of four counts of Possession, Manufacturing or Distribution of Child Pornography. On December 17, 2020, just prior to his release from prison, Chambers signed a "Parole/Suspended Sentence Standard Supervision Agreement" (Parole Agreement). He signed the agreement a second time on January 5, 2021, after his release from prison.

The terms of the Parole Agreement[1] provide for warrantless search and seizure as follows:

> I will submit my person, property, place of residence, vehicle and personal effects to search and seizure at any time, with or without a search warrant, whenever reasonable suspicion I determined by a parole agent or law enforcement. I agree to such a search and seizure at any place within or outs of the boundaries of the State of South Dakota, and at any place without or outside of "Indian Country" as defined in 18 U.S.C. § 1151.

Chambers' parole was supervised by State Parole Officer, Lillie Tacke.

---

[1] A copy of the Parole Agreement will be provided to the Court.

## 2. **Chambers under investigation.**

Approximately one month after Chambers was released from prison and placed on parole supervision, he became the subject of an online criminal investigation involving child pornography. On or about February 3, 2021, FBI Online Covert Employee (OCE) OCE-8399 initiated a Kik private message communication with Kik user "Bluntowski [muthafluckin Charlie Yall]," who claimed to be a 34-year-old male from California. He also claimed to have engaged in oral sex with the 6-year-old daughter of a friend over the course of a year. "Bluntowski" claimed to have produced explicit material of the girl but said he had subsequently deleted it. He claimed this activity occurred approximately 6 years prior, and that he no longer had access to the child. He expressed interest in meeting a child to engage in sex acts but claimed to have had a close call with law enforcement once when he arranged to meet someone he met online. "Bluntowski" was a member of the "#no.limitage" group around the time he began communicating with the undercover FBI agent.

On February 23, 2021, "Bluntowski" distributed three Mega links to OCE-8399, all appearing to depict child pornography. "Bluntowski's" distribution was linked to Charles Chambers at an address in Aberdeen and the investigation lead was sent to FBI Special Agent Joel Smith in Aberdeen. In the course of his investigation, FBI Agent Smith met with South Dakota Parole Officer Lillie Tacke who was supervising Chambers' parole. In addition to verifying Chambers'

3

resident address, FBI Agent Smith told her the details of the investigation of Chambers' suspected involvement with child pornography.

On March 22, 2021, law enforcement officers went to Chambers' residence and found him seated on the outside of his apartment building in Aberdeen. Chambers lived in an apartment of a home converted into a ten-unit apartment building. Two cell phones on a table directly in front of Chambers were seized after he confirmed they were his. Chambers later signed a form consenting to search his phones. The Consent to Search advised Chambers of his right to refuse consent and acknowledged that he gave consent voluntarily.[2]

### 3. **Chambers Interviewed.**

When law enforcement encountered Chambers on the outdoor patio area of his apartment building, FBI Agent Smith asked Chambers, "We would like to speak to you for a second, alright?" Chambers responded, "Absolutely." After his two cell phones were seized, South Dakota Parole Officer Lillie Tacke placed handcuffs on Chambers and stated he was being detained for investigative purposes. Officers then searched his apartment.[3]

FBI Agent Smith went to get his vehicle, a crew cab Ford F-150 with 4 doors. Chambers got in the front passenger seat of the pickup. FBI Agent Smith sat in the driver's seat and removed the handcuffs from Chambers' wrists.

---

2 A copy of the consent to search will be provided as an exhibit to the Court.

3 A copy of a body camera video recording will be provided to the Court.

Parole Officer Tacke sat behind FBI Agent Smith in the rear seat. Behind Chambers' passenger seat was a cage for transporting prisoners, but it remained unoccupied during the interview.

Once in the vehicle, FBI Agent Smith began recording the communication. After identifying the people in the vehicle, FBI Agent Smith told Chambers, "this is a voluntary interview, you can end it at any time, and I'm not going to be taking you into custody today. I do think it is important that you talk to me today."[4]

### B. Legal Analysis.

#### 1. Warrantless Parole Search of Residence.

The Defendant agreed to a warrantless search of his "person, property, place of residence, vehicle and personal effects" when he signed the Parole Agreement on December 17, 2020, and again on January 5, 2021. According to the Parole Agreement, the only condition for a warrantless search is a reasonable suspicion determined by the parole agent.

In this case, Chambers' parole officer authorized the search of his residence, person and personal effects based on information that Chambers had used Kik messenger to distribute child pornography. The information FBI Agent Smith shared with Parole Officer Tacke that Chambers was linked to the Kik user account "Bluntowski" in Aberdeen, was sufficient to establish reasonable suspicion that Chambers was involved in a crime.

---

[4] A copy of the audio recording will be provided to the Court.

Persons on parole have less privacy rights than the average citizen. Although the Fourth Amendment requires probable cause to obtain a search warrant, "no more than reasonable suspicion" is required to conduct a search of a probationer's house. *United States v. Knights*, 534 U.S. 112, 121 (2001). "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.*; accord *United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003) ("[W]hen a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that condition without a warrant based only upon that officer's reasonable suspicion that the probationer is violating his probation's terms.").

Parolees, like probationers, may have conditions placed upon their release from custody. Parolees are on that same "continuum" with even "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." In *Samson v. California*, 547 U.S. 843, 850 (2006). ("The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.") (internal quotation marks & citation omitted).

In the present case, the Defendant was on parole. He signed a parole

6

supervision agreement as part of that parole. One of the conditions the Defendant consented to was condition #5. That condition provided:

> I will submit my person, property, place of residence, vehicle and personal effects to search and seizure at any lime, with or without a search warrant, whenever reasonable suspicion is determined by a parole agent or law enforcement. I agree to such a search and seizure at any place within or outside of the boundaries of the State of South Dakota, and at any place within or outside of "Indian Country" as defined by 18 U.S.C. § 1151.

Accordingly, the Defendant had the very same reduced expectation of privacy outlined in *Knights* and *Samson*.

The Defendant's parole officer had knowledge that the Defendant was connected to a Kik user account that had distributed child pornography to an undercover FBI agent. With this knowledge, the parole officer had reasonable suspicion to believe the Defendant was violating the terms of his parole, which permitted a warrantless search of the Defendant's person, property, residence, vehicle, or personal effects. The search based on a parole violation was lawful, and the motion to suppress should be denied on this basis.

## 2. **Non-custodial Interview.**

The Government expects to elicit testimony and evidence at the suppression hearing showing that the Defendant was not in custody when he agreed to answer questions on March 22, 2021. Because custodial interrogation did not take place, law enforcement officers were not required to issue *Miranda* warnings to the Defendant.

It is well-established that a *Miranda* warning is not required for a non-

7

custodial interview. *Beckwith v. United States*, 425 U.S. 341 (1976). A person is not in custody for *Miranda* purposes unless the person's "freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121(1983)). Questioning may lawfully take place in police vehicles without *Miranda* warnings. *United States v. Jones*, 523 F.3d 1235 (10th Cir. 2008); *United States v. Baswell*, 792 F.2d 755 (8th Cir. 1986).

Several matters are relevant to a determination of whether an interview is custodial in nature. *See United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The *Griffin* Court identified six indicia of custody which are relevant to evaluating whether a person has been subjected to a custodial interview. *Id.* Those indicia include:

> whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.*

While the factors in *Griffin* are helpful, they should not be applied "ritualistically." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). In fact, there are some post-*Griffin* custody cases that do not mention these factors. *See United States v. Lebrun*, 363 F.3d 715 (8th Cir. 2004) (en banc)[5]. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray,* 378 F.3d at 828.

When determining whether a suspect is in custody, the Eighth Circuit has stated "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Griffin*, 922 F.2d at 1349. This Court must consider the totality of the circumstances, then decide whether a reasonable person in the Defendant's position would have considered his freedom of movement restricted to the degree associated with formal arrest. *United States v. Brave Heart*, 397 F.3d 1035 (8th Cir. 2005). The determination is based on objective facts, not the Defendant's subjective views. Id.

### A.   A *Griffin* factor analysis shows a non-custodial interview.

The facts of this case, when analyzed with the *Griffin* factors, show that the interview of Chambers was not custodial. When FBI Agent Smith removed

---

[5] One court not mentioning *Griffin* stated the issue is a two-part inquiry: "(1) was he formally placed under arrest or (2) was his freedom of movement restrained to the degree associated with a formal arrest." *United States v. Cartier,* 543 F.3d 442, 448 (8th Cir. 2008) (citing *United States v. J.H.H.*, 22 F.3d 821, 831 (8th Cir. 1994)).

9

the handcuffs from Chambers inside the FBI vehicle, he told Chambers that the interview was voluntary, and he could end it at any time. An audio recording of the entire interview confirms this advisement and verifies that Chambers proceeded with the interview. Second, Chambers was not physically restrained while interviewed in the pickup. He sat in the front seat of the parked vehicle with the door unlocked. He was not handcuffed or physically touched in any manner during the interview. Third, Chambers voluntarily agreed to speak to FBI Agent Smith. He first agreed to speak with FBI Agent Smith when the officers first encountered Chambers sitting in a chair outside of his residence. Chambers also acknowledged the interview was voluntary in the vehicle. Fourth, there was no evidence of strong-arm tactics or deceptive practices used to get him to talk. The entire discussion only lasted about 30 minutes and was all recorded.

The only *Griffin* factor supporting Chambers' argument is that he was taken into custody at the end of the interview. It should be noted, however, that he was not arrested by FBI Agent Smith for any federal offense. Instead, he was taken into custody by his State Parole Officer, Lillie Tacke, for violating the terms of his parole.

When examining these facts as a whole, they support a finding that Chambers was not in custody when he voluntarily agreed to be interviewed. Detaining a person during the search of the premises for officer safety is not a formal arrest. See *United States v. Streifel*, 781 F.2d 953 (1st Cir. 1986) (persons detained by officers securing the scene while waiting for a search warrant were

detained in the Fourth Amendment sense but were not in custody under *Miranda*. This was not a restraint comparable to a formal arrest, even though the defendants were told that they could not leave until one of the officers returned.). Here, Chambers was detained for officer safety while a search of his apartment was conducted. However, he agreed to answer questions and the handcuffs were removed. He was no longer detained and was not in custody when he was interviewed. Further, FBI Agent Smith told Chambers that he did not have to answer questions.

### B. Subsequent interviews were not tainted.

FBI Agent Smith interviewed Chambers three days later on March 25, 2021. A subsequent polygraph interview occurred on March 26, 2021. Chambers argues that because the March 22nd interview violated his rights, the subsequent interviews were not cured by *Miranda* warnings on the March 25th or 26th. DOC 27, pp. 9-11. It is the Government's position that the interviews of March 25th and 26th were lawful because the March 22nd interview did not violate the Defendant's Constitutional rights.

### C. March 25th waiver was knowing, voluntary and intelligent.

Chambers claims he did not voluntarily, knowingly, and intelligently waive his rights when interviewed on March 25th. DOC 27, p.11. A recording of the interview will be supplied to the Court. The Government relies on the recording to support a valid waiver.

### D. March 26th interview did not violate Chambers' rights.

Chambers was interviewed on March 26th at the county jail. He argues

11

that all statements he made prior to a Miranda warning 26 minutes after the interview began should be suppressed. DOC 27, pp. 11-12. Chambers was placed in custody on March 22nd and remained in custody through March 26th. The *Miranda* warning provided to him on March 25th still applied.

## Conclusion

For the above-stated reasons, the United States requests the Court deny Defendant's Motion to Suppress.

Dated and electronically filed this 29th day of September, 2021.

DENNIS R. HOLMES
Acting United States Attorney

*/s/ Jeffrey C. Clapper*

_____

Jeffrey C. Clapper
Assistant United States Attorney
P.O. Box 2638
Sioux Falls, SD 57101-2638
(605) 330-4400
Email: jeff.clapper@usdoj.gov